IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>BABU RAMARAJ,<br><br>*Defendant.* | **UNDER SEAL**<br><br>Case No.: 1:24-MJ-203 |

**AFFIDAVIT IN SUPPORT OF**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Michael Major, Special Agent, Federal Bureau of Investigation ("FBI"), Washington Field Office, Washington, DC, being duly sworn, do declare and state:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been in this position since 2004. Since graduating from the FBI Academy at Quantico, Virginia, I have investigated criminal matters including financial crimes, organized criminal enterprises, violent crimes, and public corruption. I have served as a Supervisory Special Agent in both the Counterterrorism and Criminal Investigative Divisions at FBI Headquarters. In January 2016, I began my current assignment investigating corporate fraud in the Washington, D.C. Division. Prior to becoming a Special Agent, I worked as a Certified Public Accountant for a public accounting firm. Through my employment with the FBI, I have gained knowledge in the use of various investigative techniques including investigative interviews, financial analysis, the service of Administrative and Grand Jury Subpoenas, and the execution of search and arrest warrants.

1

**GENERAL INFORMATION**

2.      The information contained in this affidavit has been provided to me by witnesses, other agents and law enforcement officers, regulatory officials, records obtained via grand jury subpoena, public source information, and my training and experience.  This affidavit is intended to demonstrate there is sufficient probable cause for the requested arrest warrant and does not set forth all my knowledge about this investigation.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements.

3.      The FBI and the U.S Attorney's Office learned of the scheme more fully described below when criminal defense attorneys for INDIVIDUAL A and INDIVIDUAL B came forward to disclose the scheme in or around March 2024.  INDIVIDUAL A, represented by attorney Marvin D. Miller, was interviewed under protection of a proffer letter signed by an Assistant United States Attorney. INDIVIDUAL A later signed a letter immunity and cooperation agreement with the United States Attorney's Office.  INDIVIDUAL B, represented by attorneys Libbey Van Pelt and Frank Salvato, also came forward around the same time.  INDIVIDUAL B was interviewed under the terms of a letter immunity and cooperation agreement with the United States Attorney's Office. I found both witnesses to be credible.  To date, their information has been corroborated by available documentary evidence and additional witness interviews.

4.      As a result of my participation in this investigation, I am familiar with all aspects of the investigation.  Based on this familiarity and based on other information which I have reviewed and determined to be reliable, I allege the facts show there is probable cause to believe BABU RAMARAJ ("RAMARAJ") conducted a Ponzi-type investment fraud scheme through which he defrauded multiple victims out of millions of dollars in violation of Title 18, United

States Code, Section 1343 (Wire Fraud), then diverted the proceeds into a securities trading account in violation of Title 18, United States Code, Section 1957 (Engaging in Financial Transactions in Criminally Derived Property). In conducting the scheme, RAMARAJ also used without lawful authority the means of identification of another person during and in relation to the wire fraud scheme, in violation of Title 18, United States Code, Section 1028A(a)(1). It is estimated that RAMARAJ has inflicted over $12,000,000 in losses on over a dozen victims. Collectively, these offenses are described as the "SUBJECT OFFENSES."

## STATEMENT OF FACTS SUPPORTING PROBABLE CAUSE

*Victim/Witness Interviews*

**Information provided by INDIVIDUAL A**

5. The FBI interviewed INDIVIDUAL A in April 2024. INDIVIDUAL A met RAMARAJ through their shared participation in a Northern Virginia recreational sports league. In or around September 2021, RAMARAJ told INDIVIDUAL A he (RAMARAJ) owned a civil engineering and consulting company (DAB) that did a great deal of quality assurance work. RAMARAJ said his company won more work than it could take because the contracts it won required up-front bond payments of 7% to 10% of the contract value. RAMARAJ explained these bonds were essentially front money that ensured DAB would see the contract through to completion.

6. RAMARAJ told INDIVIDUAL A he needed to borrow money for the bonds because his company was relatively new, and he could not obtain traditional financing. RAMARAJ said he paid massive returns on the money he borrowed because he felt he owed it to his creditors. Absent his creditors, RAMARAJ said, he would not be able to secure the profitable contracts he won. RAMARAJ explained DAB obtained so many contracts because his wife was

a part owner, making DAB both woman-owned and minority-owned. RAMARAJ said large government agencies maintained budgets specifically for contracts to be awarded to companies like DAB.

7. In or around September 2021, RAMARAJ told INDIVIDUAL A that DAB obtained a contract with "The Boring Company" (an infrastructure, tunnel construction company founded by Elon Musk). RAMARAJ asked to borrow $40,000 for approximately a month and a half to cover the bond associated with the contract. RAMARAJ said he would pay INDIVIDUAL A $16,000 in interest and return his principal at the end of the loan. INDIVIDUAL A agreed and provided RAMARAJ the money, while RAMARAJ provided INDIVIDUAL A with a signed promissory note. RAMARAJ paid the $16,000 interest as promised, and INDIVIDUAL A later rolled the $40,000 loan principal into a separate future loan to RAMARAJ.

8. INDIVIDUAL A continued loaning funds to RAMARAJ, and RAMARAJ continued making timely interest payments. RAMARAJ provided INDIVIDUAL A copies of the contracts RAMARAJ claimed DAB won, and INDIVIDUAL A relied on these contracts when loaning RAMARAJ money. INDIVIDUAL A later learned RAMARAJ falsified these contracts.

9. In or around June 2022, with RAMARAJ still requesting additional loans, INDIVIDUAL A ran out of liquidity having already loaned RAMARAJ over $1 million. RAMARAJ told INDIVIDUAL A that he (RAMARAJ) would pay INDIVIDUAL A higher interest rates on his loans if he successfully enlisted additional lenders. With this financial incentive, along with his belief that loans to RAMARAJ were profitable, INDIVIDUAL A began recruiting friends, family, and colleagues. INDIVIDUAL A helped facilitate loans between new lenders/investors and DAB. Based on discussions with RAMARAJ, INDIVIDUAL A knew DAB paid new investors 40% to 50% annualized interest on their loans. Because he brought in new

investors, INDIVIDUAL A received "sweetheart deals" with higher returns. Over time, INDIVIDUAL A and one of his associates (INDIVIDUAL B) identified for RAMARAJ as many as 20 additional lenders.  *Note: The FBI interviewed INDIVIDUAL B.  Additional details are included later within this Affidavit.*  During subsequent lender meetings or teleconferences, RAMARAJ claimed DAB had $80 million in ongoing contracts.

10. INDIVIDUAL A continued to interact with other lenders who, over time, collectively discovered errors and inconsistencies in RAMARAJ's representations.  One lender, for example, identified a mathematical error within a contract RAMARAJ shared.  INDIVIDUAL A learned through INDIVIDUAL B that RAMARAJ stopped working with an external accountant he had previously retained when the accountant demanded details and supporting documentation regarding DAB prior to filing the organization's tax return.  The accountant warned INDIVIDUAL B to be wary of RAMARAJ, as the accountant had identified documents such as invoices and bank statements the accountant believed RAMARAJ falsified or otherwise altered.  *Note: The FBI interviewed the referenced accountant (INDIVIDUAL D).  Additional details are included later within this Affidavit.*

11. In early October 2023, INDIVIDUAL A and INDIVIDUAL B confronted RAMARAJ about DAB.  The two told RAMARAJ to come clean or else they would contact the authorities.  RAMARAJ admitted he made some fraudulent representations about DAB but insisted some of it (the company) was legitimate.  Later that month, RAMARAJ signed a "hold harmless" letter that INDIVIDUAL B's civil attorney had drafted. Generally, the signed letter confirmed RAMARAJ sometimes falsified financial statements and documents pertinent to DAB and confirmed that INDIVIDUAL A and INDIVIDUAL B were unaware of the fraud.  Images of

the introductory paragraphs (names redacted) and the signature block of the referenced letter follow:

**ACKNOWLEDGEMENT**

THIS ACKNOWLEDGMENT is made this 2nd day of October, 2023 by Babu Ramaraj, member of DAB Inspection and Consulting Services, LLC;

I, Babu Ramaraj, hereby expressly admit, agree, and acknowledge that I have knowingly and intentionally falsified, fabricated, and tampered with various financial statements and documents of DAB Inspection and Consulting Services, LLC from time to time. I hereby further expressly admit, agree, and acknowledge [REDACTED] had no knowledge of or involvement in these acts whatsoever and I hereby indemnify and hold harmless each of them from any and all lawsuits, monetary awards, claims, debts, fees, taxes, levies, imposts, interest charges, losses, damages, fines, liabilities, obligations, penalties, including without limitation, attorneys' fees, arising out of, based upon, resulting from, or in connection with these acts or documents.

Below is a list of some, but not all, of such financial statements and documents.

**List of tampered documents:**

---

I declare under penalty of perjury that the foregoing is truthful and correct.

_____ 10/24/23 (SEAL)
BABU RAMARAJ

12.  INDIVIDUAL A believes RAMARAJ borrowed as much as $17 million from his creditors. Based on his "due diligence" efforts to determine DAB's financial status and to confirm how RAMARAJ allocated lender funds, INDIVIDUAL A believes RAMARAJ sent a lot of money to Interactive Brokers (an online trading platform), and purchased an expensive home in Aldie, Virginia. *Note: Financial records confirm RAMARAJ sent millions to Interactive Brokers, as discussed later in this Affidavit.*

13. INDIVIDUAL A told the FBI that in late 2023 and early 2024 he worked to encourage RAMARAJ to repay to lenders (including INDIVIDUAL A) the money RAMARAJ owed. RAMARAJ failed to pay his debts, however, and became increasingly rude and aggressive with INDIVIDUAL A and other investors. Investors began filing complaints with law enforcement and regulatory agencies.

**Information provided by INDIVIDUAL B**

14. The FBI interviewed INDIVIDUAL B in May 2024. Like INDIVIDUAL A, INDIVIDUAL B met RAMARAJ through their shared participation in a Northern Virginia recreational sports league. After INDIVIDUAL A told INDIVIDUAL B about the potential to realize great returns loaning money to RAMARAJ, INDIVIDUAL B met with RAMARAJ in September 2021 to discuss the matter. RAMARAJ described DAB and told INDIVIDUAL B that he (RAMARAJ) needed to secure $400,000 to make a bond payment on a $4 million contract with the city of Alexandria, Virginia. INDIVIDUAL B agreed to RAMARAJ's proposal and wired $199,000 to a DAB bank account (bank account records I reviewed confirm this transfer). As promised, per INDIVIDUAL B, RAMARAJ made monthly interest payments of $14,000 and repaid the loan principal at the end of the loan term.

15. INDIVIDUAL B made additional loans to RAMARAJ, always believing (based on RAMARAJ's representations) the funds were allocated to bond payments associated with DAB contracts. For the initial loans INDIVIDUAL B made to RAMARAJ, INDIVIDUAL B reviewed DAB contracts and agreements associated with the relevant DAB contracts. INDIVIDUAL B told the FBI he loaned DAB approximately $3.54 million between 2021 and 2023. INDIVIDUAL B received interest payments and returns of principal of approximately $2.4 million, and thus lost

approximately $1.1 million.  *Note: I have reviewed financial records reflecting extensive wire transfer activity between an entity INDIVIDUAL B controls and DAB bank accounts.*

16. INDIVIDUAL B became increasingly involved in DAB throughout 2022 and 2023, as INDIVIDUAL B (as well as INDIVIDUAL A) wanted DAB to operate more efficiently and effectively. INDIVIDUAL B attributed problems with DAB's financial situation to what INDIVIDUAL B perceived to be RAMARAJ's inability to efficiently run a business. INDIVIDUAL B did not initially question DAB's validity or that of its alleged projects, as INDIVIDUAL B relied on the contracts and other documents RAMARAJ showed INDIVIDUAL B and other lenders.

17. As additional investors loaned money to RAMARAJ throughout 2022, they suggested DAB required additional oversight.  In furtherance of that goal, INDIVIDUAL B (and INDIVIDUAL A) each became 1% equity owners or members in DAB in November 2022. RAMARAJ remained a 47% owner, while his wife remained a 51% owner.  RAMARAJ told INDIVIDUAL B his wife's 51% ownership stake was important because it made DAB both minority-owned and woman-owned, which opened the door to major contracts earmarked for such companies.

18. Into 2023, DAB's financial situation was largely unclear to INDIVIDUAL B. INDIVIDUAL B wanted a better accounting of DAB's transactions.  INDIVIDUAL D, an external accountant DAB hired, complained she could not effectively reconcile DAB's transactions because she lacked sufficient transaction detail.  INDIVIDUAL B later became alarmed when, in reviewing DAB bank account statements, he saw some overdraft charges.  INDIVIDUAL B did not understand how DAB, a company allegedly earning millions in revenues, could face overdraft charges. RAMARAJ said the charges resulted not from insufficient funds, but from poor

bookkeeping. INDIVIDUAL B believed DAB needed to replace its external accountant, and RAMARAJ told INDIVIDUAL B he fired the accountant (INDIVIDUAL D). INDIVIDUAL B later learned INDIVIDUAL D resigned. INDIVIDUAL D later told INDIVIDUAL B that RAMARAJ provided her what she believed to be fraudulent documents.

19. In approximately October 2023, after RAMARAJ ceased making timely interest payments to INDIVIDUAL B and other lenders, INDIVIDUAL B reviewed some of the documents RAMARAJ previously provided as proof of DAB's business dealings. INDIVIDUAL B sent copies of some of DAB's alleged contracts to a friend who formerly worked for a local county, and the friend said the contracts did not look right. INDIVIDUAL B, who has extensive computer technology experience, conducted additional research. By reviewing document metadata, INDIVIDUAL B determined RAMARAJ created the contracts and subcontractor invoices on a Windows computer. INDIVIDUAL B and INDIVIDUAL A confronted RAMARAJ, who admitted to falsifying the documents while still insisting DAB was a legitimate entity.

20. Later in October 2023, INDIVIDUAL B accompanied RAMARAJ to a Truist bank location and asked bank personnel to confirm the source of certain deposits (credits) in the DAB bank account. Bank personnel explained the credits, which RAMARAJ previously told INDIVIDUAL B were receipts from DAB customers, were from either RAMARAJ or entities he controlled. The true nature of these deposits, coupled with the falsified documents, convinced INDIVIDUAL B there was no real substance to DAB. RAMARAJ signed the above-referenced acknowledgement letter (the "hold harmless" letter) on October 22, 2023.

21. INDIVIDUAL B, along with INDIVIDUAL A, attempted to work with RAMARAJ to find a way for him to repay the DAB lenders. RAMARAJ continued to claim DAB was a real business, that it had millions in accounts receivable, and that it funded millions in bond payments.

RAMARAJ claimed he would repay lender funds, but never did. INDIVIDUAL B told the FBI he communicated with RAMARAJ via email, text message, and telephone call. INDIVIDUAL B noted that other DAB investors contacted RAMARAJ via text message when demanding loan repayment.

**Information provided by INDIVIDUAL C**

22. The FBI interviewed INDIVIUDAL C in March 2024. INDIVIDUAL C met RAMARAJ through INDIVIUDAL C's friend from college, INDIVIDUAL A. INDIVIDUAL C was interested in the investment opportunity RAMARAJ offered. INDIVIDUAL C attended a meeting at INDIVIDUAL A's home at which RAMARAJ presented his investment opportunity to approximately five prospective lenders. RAMARAJ said he had a contract pipeline with "DC Water" and the Virginia Department of Transportation, and that he required investor funds (loans) to secure the contracts. Per RAMARAJ, the contract issuers would hold the funds as an emergency reserve.

23. In approximately June 2022, INDIVIDUAL C wired DAB's Truist bank account $200,000 pursuant to a signed and notarized promissory note (RAMARAJ signed the note, though INDIVIDUAL C did not). The loan terms stipulated INDIVIDUAL C would receive $7,000 in monthly interest through the term of the loan and recover his $200,000 principal when the loan expired in August 2024. INDIVIDUAL C loaned an additional $400,000 to RAMARAJ in September 2022. Based on the new loan agreement, INDIVIDUAL C was to receive $20,000 in monthly interest payments.

24. In approximately June 2023, RAMARAJ held an investor meeting and announced new projects to approximately 25 investors. RAMARAJ presented spreadsheets and financial

documents that indicated DAB was in a healthy financial condition. INDIVIDUAL C did not make an additional investment because he had no available funds.

25. RAMARAJ made timely interest payments to INDIVIDUAL C until approximately October 2023. RAMARAJ told investors the government ceased making payments on the contracts, preventing RAMARAJ from paying his subcontractors and investors. RAMARAJ claimed DAB had significant accounts receivables and promised to catch up on payments. In total, INDIVIDUAL C loaned RAMARAJ $600,000 and received interest payments of approximately $220,000. INDIVIDUAL C did not recover any of his principal despite asking RAMARAJ for his money back. INDIVIDUAL C estimates approximately 25 investors lost approximately $15 million through loans to RAMARAJ.

**Information provided by INDIVIDUAL D**

26. The FBI briefly interviewed INDIVIDUAL D in April 2024. INDIVIDUAL D is the independent accountant RAMARAJ at one time retained, referenced previously in this Affidavit. INDIVIDUAL D terminated her business relationship with RAMARAJ after he provided her fraudulent information. INDIVIDUAL D could not provide RAMARAJ accounting services because the documents he provided did not make sense. After INDIVIDUAL D asked RAMARAJ to have third parties send her information directly so she could verify it, INDIVIDUAL D believes RAMARAJ created phony email addresses pretending to be his customers and vendors.

27. INDIVIDUAL D provided the FBI additional information in May 2024. INDIVIDUAL D noted she was unable to reconcile DAB invoices with payments received. Despite RAMARAJ "pushing very hard" for drafted financial statements in advance of an investor meeting, INDIVIDUAL D refused to issue even draft statements for 2022 and 2023.

INDIVIDUAL D suspected something was "seriously wrong." INDIVIDUAL D ultimately requested direct access to a specific DAB bank account, which RAMARAJ never provided. INDIVIDUAL D quit working with DAB in June 2023 and told two DAB "board members" that INDIVIDUAL D was not responsible for any financial statements DAB presented.

*Fraudulent Documents*

28. RAMARAJ told INDIVIDUAL A that a specific engineering firm (COMPANY A) was both a vendor for and a competitor of DAB. RAMARAJ claimed while COMPANY A competed for the types of contracts DAB obtained, DAB also used COMPANY A as a subcontractor. During his scheme, RAMARAJ cited COMPANY A invoices as evidence of DAB's ongoing work. I reviewed multiple alleged COMPANY A invoices, provided by INDIVIDUAL A to the FBI, that appear to bill DAB substantial sums (often millions of dollars) for work performed. A redacted portion of one such invoice, which appeared on COMPANY A letterhead, follows:

> May 01, 2023
>
> Babu Ramaraj, PE
> DAB Inspection and Consulting Services, LLC
> 107 Carpenter Drive, Suite 215
> Sterling, VA 20164
>
> Attention:   Mr.  Babu  Ramaraj,  P.E
> Invoice for the Month of April 2023
>
> Dear Mr. Babu Ramaraj:
>
> Please find herewith the Invoice for the Month of April 2023. Please contact us if you have any questions. Total Hours from all the inspectors in the field from all the projects based on the field timesheets as verified. Also, attached herewith the invoice for DC Water Drilling for Potomac Tunnel River Project.
>
> Invoice for April 2023:
>
> | Inspectors | Total Hours | Amount |
> |---|---|---|
> | 254 | 55927 | $ 2,516,750.00 |
>
> Drilling for Potomac River Tunnel - $1,025,000.00
> Total Invoice    =            $ 3,541,750.00
>
> Sincerely,
>
> [redacted]
>
> Manager of Operations

29. In March 2023, COMPANY A's President and Chief Executive Officer told the FBI that COMPANY A has no record of ever doing work for DAB or RAMARAJ. The COMPANY A President later reviewed invoice examples (like that shown above) and confirmed to the FBI they were fraudulent. Notably, the signature on the invoices did not appear to match the typed name listed below (names redacted in the invoice example above). The COMPANY A President explained the signature shown on the invoices appeared to belong to an individual who ceased working for COMPANY A several years prior. The typed name below the signature belonged to a current COMPANY A employee. I believe RAMARAJ identified individuals associated with COMPANY A through online research or other means, then fraudulently used their names/identities to lend credibility to the documents he created. Additionally, in the "hold harmless" letter previously referenced within this Affidavit, RAMARAJ listed COMPANY A invoices as some of the documents he falsified, fabricated, or tampered with. Finally, the invoice shown above is an example of the type of document INDIVIDUAL B determined, through metadata analysis, that RAMARAJ created.

30. During a March 2024 meeting, attorneys representing two RAMARAJ associates notified the FBI that during his scheme RAMARAJ provided one or more DAB lenders numerous fraudulent documents. The fraudulent documents included a FAA (Federal Aviation Administration) project award to DAB. One of the attorneys at the meeting later provided the FBI a copy of the purportedly fraudulent FAA project award, a portion of which is shown below:



02/23/2022                                                    AC 150/5100-14E

**U.S. Department of Transportation**
**Federal Aviation Administration**

# CONTRACT AWARD

**Subject:** Engineering, and Consultant Services for Airport Grant Projects     **Date:** 02/23/2022     **AC No:** 150/5100-14E
**Initiated By:** AAS-100

1. **Purpose.**
   This advisory circular (AC) is to award DAB Inspection and Consulting Services, LLC to represent FAA to manage the Construction Management and Quality Assurance & Engineering Services for the regional airport design and construction within the States of Maryland, Virginia and District of Columbia. We hereby authorize DAB Inspection and Consulting Services, LLC to proceed with the bond payment for an amount of $580,000 towards the Payment and Performance Bond throughout the duration of the project and will be reimbursed after the project completion.

2. **Award Amount.**
   This AC has been created for performing the engineering review and construction management for a lumpsum amount of $ 5,800,000.00 for a period of Two years and the tentative project start will be April 1st week.

We are pleased to have you on board and work with us, thanks for being part of the FAA organization. Please feel free to reach out to us if you have any questions.

---

31. In March 2024, a Special Agent for the Department of Transportation Office of the Inspector General, after confirming with the Internal Investigations Division of the Federal Aviation Administration (FAA), notified the FBI that the FAA did not have any contract history with DAB. As with the COMPANY A invoice above, RAMARAJ conceded in his "hold harmless" letter that the FAA contract award was a "tampered document." Based on my review

of relevant documents and my interview of RAMARAJ victims, I believe RAMARAJ used these falsified documents to mislead prospective lenders regarding DAB, its financial position, and the contracts it allegedly secured. I further believe RAMARAJ falsely told lenders their funds would be dedicated to "bonds" associated with lucrative DAB contracts when RAMARAJ instead used lender funds for other purposes. Additional financial analysis follows.

*Financial Analysis*

32. While the FBI's financial analysis of DAB and RAMARAJ is not yet complete, review of multiple DAB and RAMARAJ financial accounts supports the allegations already set forth in this Affidavit. Based on my review, it does not appear RAMARAJ devoted investor funds to "bonds" securing lucrative contracts, or that DAB enjoyed the revenues and financial success RAMARAJ claimed. Rather, RAMARAJ seems to have engaged in a Ponzi scheme in which he used new lender funds to cover interest owed to prior lenders. Further, RAMARAJ appears to have allocated a substantial portion of the borrowed funds for his personal use, specifically for investment trading.

33. INDIVIDUAL A noted be believed RAMARAJ sent lender funds to trading accounts at Interactive Brokers. I reviewed cashiering records for multiple accounts RAMARAJ held at Interactive Brokers. Between approximately January 2021 and June 2023, through more than 80 wire/electronic transfers from bank accounts he controlled, RAMARAJ sent over $4.8 million to his Interactive Brokers accounts. As demonstrated below, DAB lenders (who thought they were funding bonds securing the company profitable contracts) appear to have funded these transfers. Many transfers to Interactive Brokers, in fact, originated from the DAB Truist bank account to which RAMARAJ instructed multiple lenders to wire their loans. Examples follow.

34.     Two individuals who loaned money to DAB each sent a $100,000 transfer ($200,000 total) to a DAB Truist bank account on May 30, 2023, as reflected in DAB Truist account records.  On the same date, RAMARAJ transferred $100,000 to one of his accounts at Interactive Brokers, as reflected in both Truist and Interactive Brokers records.

35.     Throughout May 2023, the referenced DAB Truist bank account received deposits, credits, and interest of over $1.3 million and tallied withdrawals, debits, and service charges of over $1.1 million. The account inflows appear comprised mainly of transfers from other RAMARAJ-controlled accounts and transfers from known or suspected DAB lenders. Specifically, multiple large wire transfers to DAB originated from individuals or entities located in Northern Virginia.

36.     INDIVIDUAL B electronically transferred $300,000 to a DAB Truist bank account on August 16, 2023, as reflected in DAB Truist account records.  INDIVIDUAL B told the FBI he believed, based on his dealings with RAMARAJ, all the funds be sent DAB were destined for bonds associated with DAB contracts. Truist bank records indicate that on the same date, RAMARAJ completed two $50,000 transfers from the same DAB Truist bank account to an Interactive Brokers account associated with RAMARAJ or held in his wife's name.  The next day (August 17, 2023), per Truist records, RAMARAJ transferred an additional $75,000 to an Interactive Brokers account associated with him or held in his wife's name.  On August 18, 2023, Truist records reflect a $186,000 transfer from the same DAB bank account to a Bank of America account associated with an investment company controlled by INDIVIDUAL A (another DAB creditor) and his wife.  It thus appears that rather than funding bonds, RAMARAJ directed INDIVIDUAL B's $300,000 to trading accounts in his name or his wife's name and to other DAB lender(s).

37. DAB's Truist bank accounts do reflect what I believe to be some amount of legitimate business income. Based on my initial review, however, most or all these revenues appear to originate from individuals paying for home improvement contracting projects such as backyard deck and patio work. My review has not identified substantial revenues from large quality assurance engineering projects with major municipalities or government entities. I have not identified any financial records suggesting RAMARAJ/DAB funded large bonds or received multimillion dollar revenues.

38. I reviewed records for a DAB business checking account held at Northwest Federal Credit Union (NWFCU). The March 2024 account statement reflects beginning and ending balances of approximately $25 and $96, respectively. Total deposits and withdrawals to and from the account in March 2024 exceeded $1.18 million. While I have not yet interviewed individuals (or representatives of entities) who sent money to or received money from DAB's NWFCU checking account, the March 2024 account activity appears consistent with RAMARAJ's scheme as described throughout this Affidavit. RAMARAJ/DAB received numerous substantial electronic transfers from different individuals and entities. These transfers appear generally consistent with the loans I know other DAB investors previously sent to other DAB banks such as Truist and TD Bank. The recent activity in DAB's NWFCU account is also consistent with information known investors provided the FBI – specifically that RAMARAJ continues to defraud additional (new) investors.

39. Multiple DAB lenders told the FBI that RAMARAJ retains family connections in India and that they believe RAMARAJ plans to flee the United States, either to India or another location, possibly as soon as June 2024, after the conclusion of his children's school years. Recent information indicates RAMARAJ may be in the process of liquidating vehicles, and it has been

reported that he stopped paying at least one DAB employee their wages. Department of Homeland Security records I reviewed confirm RAMARAJ has a significant international travel history. The FBI financial review confirmed multiple RAMARAJ monetary transfers to India. In July 2022, for example, a DAB Truist bank account transferred $200,000 to an Indian bank account associated with RAMARAJ's wife. The wire transfer records include originator to beneficiary information of "property purchase." Travel and financial records, then, support DAB lender claims of RAMARAJ's overseas ties. As such, this warrant application seeks authority to seize RAMARAJ's and his wife's (a DAB owner) travel documents (additional details included in Attachment B-1) and cash or monetary instruments of a value greater than $1,000. Moreover, RAMARAJ and his wife, Vijayalakshmi Murugesan, who is the majority DAB owner, was recently sued under diversity jurisdiction in the Eastern District of Virginia by two of his North Carolina investors. See *Gudena & Namballa v. Ramaraj, DAB, & Murugesan*, No. 1:24-cv-722-CMH-LRV, (E.D. Va. May 1, 2024). These allegations, which are consistent with what other victims have told law enforcement, are likely to place further pressure on RAMARAJ and his spouse. Although we have attempted to remain covert until the execution of the requested warrant, the confluence of events could prompt RAMARAJ to flee to India at any time, as his Ponzi scheme collapses around him.

## **CRIMINAL VIOLATIONS**

40. On or about July 29, 2022, RAMARAJ executed a $200,000 wire transfer from a DAB Truist bank account to beneficiary bank "Icici Bank Limited," Mumbai, India, with his wife listed as the wire transfer beneficiary. The wire transfer records include originator to beneficiary information of "property purchase." The DAB Truist bank account balance at the beginning of July 2022 was approximately $224. Deposits into the account throughout July 2022 include

transfers from known and suspected DAB lenders. The July 29, 2022, international wire transfer represents a violation of Title 18, United States Code, Section 1343 (Wire Fraud).

41. Two individuals who loaned money to DAB each sent a $100,000 transfer ($200,000 total) to a DAB Truist bank account on May 30, 2023, as reflected in DAB Truist account records. On the same date, RAMARAJ transferred $100,000 to one of his accounts at Interactive Brokers, as reflected in both Truist and Interactive Brokers records. RAMARAJ's May 30, 2023, $100,000 transfer to Interactive Brokers represents a violation of Title 18, United States Code, Section 1957 (Engaging in Financial Transactions in Criminally Derived Property).

42. During the course of his scheme, RAMARAJ affixed the names of two individuals to alleged invoices from a specific company (COMPANY A) purporting to bill DAB for services rendered. RAMARAJ provided these fraudulent invoices to DAB lenders as evidence of DAB's legitimacy. RAMARAJ thus used without lawful authority the means of identification of another person during and in relation to the wire fraud scheme, in violation of Title 18, United States Code, Section 1028A(a)(1).

43. I respectfully request, pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Criminal Complaint. I submit that Assistant United States Attorney Russell L. Carlberg, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

//
//
//

## CONCLUSION

44. Based on the foregoing, I believe there is probable cause to issue an arrest warrant for BABU RAMARAJ for violating Title 18, United States Code, Section 1343 (Wire Fraud), Title 18, United States Code, Section 1957 (Engaging in Financial Transactions in Criminally Derived Property), and Title 18, United States Code, Section 1028A(a)(1) (Aggravated Identity Theft).

Respectfully submitted,

_____
Michael Major
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 via telephone on May 28, 2024.

_____
Hon. William B. Porter
United States Magistrate Judge